OLiSON, Administrator, Respondent, v. CHICAGO, MILWAU-
KEE & ST. PAUL RAILWAY COMPANY, Appellant.

(182 N. W. 454.)

(File No. 4768.    Opinion filed March 21, 1921.)

1.  **Negligence—Federal Employers' Liability Act, Carrier's Liability
    For Injury, Death, Resulting "In Whole or in Part" From
    Negligence—Contributory Negligence, Immateriality Of.**

    Under Federal Employers' Liability Act (Secs. 8657 to 8665,
    U. S. Comp. St. 1918,) a railway company is a common carrier
    and is liable for injury or death resulting "in whole or in
    part" from negligence of its officers, agents, or employees; and
    contributory negligence by party injured is not sufficient in
    itself to defeat recovery.

2.  **Negligence—Death of Railway Bridge Employee—Bridge Car-
    penter Safely on Bridge Cap While Train Approaching, Or-
    dered To Remain, Killed While Running From Bridge, Non-
    Negligence By Trainmen, Effect Re Liability—Directing Ver-
    dict.**

    Plaintiff's decedent, a bridge carpenter employed by defendant
    company in repairing a railway bridge sixty to eighty feet
    long, located a quarter of a mile west of L station, while
    standing about the middle of the bridge on one of the project-
    ing timbers called caps about 2½ feet below the top of the
    rails, was assisting in leveling the railway track resting on the
    bridge.  An east-bound train, previously known by the work-
    men to be on time, running on a slight down grade at 75
    miles per hour, whistled for L station before it came around
    a curve within sight from the bridge (such train not being
    visible more than 1700 to 2200 feet from the bridge.)  When
    it whistled co-assistant shouted "it's coming," and immediately
    ran westward and cleared the bridge about half a minute
    before the train struck it, decedent being ordered by the fore-
    man to stay where he was, and remained there long enough for
    another employee engaged near him to run and clear the east
    end of the bridge, but who then immediately jumped on the deck
    of the bridge, ran toward the east end, stopped, turned about
    and looked back at the train, then again ran toward the end,
    the coemployee who had arrived there calling out to him to
    jump, and had he done so could have landed upon the ground
    and saved himself; deceased being struck and killed by the
    train just before reaching the bridge end.  The undisputed
    evidence showed it was perfectly safe to remain on said cap
    while the train passed over the bridge.  **Held,** that defendant
    company was not guilty of negligence, and did not fail to take
    all necessary precautions for decedent's safety, and verdict

should have been directed for defendant. So held, under Federal Employers' Liability Act (Secs. 8657 to 8665, U. S. Comp. St., 1918.)

3. **Same—Bridge Crews, Warning To Of Train's Approach, Employee's Duty Re—Rule.**

·Under the evidence it was not customary, nor was there any rule ·requiring that trains should slow up or stop when approaching a bridge, to give bridge crews time to leave it, nor, under the circumstances shown, was it necessary to do so. While one working on a bridge over which trains are passing is entitled to sufficient warning of its approach and an opportunity to get out of the way before the train reaches him, yet if given such warning and opportunity, his duty is to act with reasonable promptness for his safety; and as decedent knew the ·train was a fast one and would reach the bridge about when it did, and knew when it whistled and that in order to leave the bridge before it arrived he must act promptly, yet it does not appear it was necessary for him to leave the bridge. Nor is absence of showing that he had never before remained on a cap while a train was passing a bridge, material.

4. **Same—Employee's Change of Mind Re Leaving Bridge, Non-Necessity Therefor—Escape By Sway Braces Expedient, Decedent's Duty Re.**

While from the evidence it is apparent that decedent's first intention was to remain on the cap while the train passed, he evidently became frightened or overawed by thought of so doing; but even so, he had a more convenient and rapid means of escape by descending one of the sway braces extending diagonally across the rows of bridge piles reaching from the cap on one side of the bridge to the ground on the other—a means commonly used.

Appeal from Circuit Court, Corson County. HON. RAYMOND L. DILLMAN, Judge.

Action by Oscar A. Olson, as Administrator of the Estate of Thomas A. Cunningham, Deceased, against the Chicago, Milwaukee & St. Paul Railway Company, a corporation, to recover damages for negligent killing of plaintiff's decedent. From a judgment for plaintiff, and from an order denying a new trial, defendant appeals. Reversed.

*Ed. L. Grantham,* and *C. O. Newcomb,* for Appellant.
*W. M. Potts,* and *Frank McNulty,* for Respondent.

(3) To point three, Appellant cited: Hinz v. C., B. & Q., (Wis.) 66 N. W. 718; N. P. Ry. Co. v. Hambly, 154 U. S. 357.

(5)  To point five, Respondent cited: Norfolk & W. Ry. Co. v. Holbrook, 215 Fed. 687, 131 C. C. A. 621.

POLLEY, P. J.  One Thomas A. Cunningham was a bridge carpenter in the employ of the appellant, and while engaged in the repair of a bridge crossing a draw on appellant's line of railway in Corson county was struck and killed by a locomotive pulling one of defendant's trains.  Plaintiff is administrator of decedent's estate and brings this action for the recovery of damages for decedent's death.  Verdict and judgment were for plaintiff and defendant appeals.

The bridge on which the accident occurred is about a quarter of a mile west of Langdon.  It is a pile bridge some 60 to 80 feet in length.  The piles are set in rows five piles in a row, and the rows are at right angles to the line of the track.  On top of the piles are timbers 16 to 18 inches high, called "caps."  On the caps parallel with line of the track are other timbers 16 to 18 inches square, called "stringers."  The ties rest on the stringers, the rails on the ties and between the rails, the ties are decked with tin, or, more properly speaking, sheets of galvanized steel, to keep cinders from falling down onto the timbers of the bridge. the caps are some 2½ feet below the top of the rails and extend out at the side a distance of 2½ or 3 feet beyond the ends of the ties.

From the bridge in question to a point about 600 feet west, the track is straight.  At this point the track curves to the south and passes through a cut some 10 feet deep.  This cut obscures the view so that when looking to the west from the bridge a train cannot be seen more  than 1,700 to 2,200 feet.

The train that caused the accident is known as train No. 18, and is a fast, through passenger train.  This train was coming from the west and was due to pass the bridge about 5 o'clock in the afternoon.

Just how long the decedent had been engaged as a bridge carpenter does not appear, but at the time of the accident he was about 30 years old.  He appears to have been an experienced bridge carpenter and was in the full use of his mental faculties, at least it was not claimed that either his sight or hearing was in any wise defective.

The bridge crew consisted of six men, one of whom, Ru-

4—Vol. 44, S. D.

dolph Buckholtz, was acting as foreman. During the afternoon in question this foreman and the decedent took a motorcar and went to the town of Morrison to ascertain if train No. 18 was on time. They, or at least the foreman, learned that it was and returned to the bridge and resumed work. When the train came it whistled for the station of Langdon, before it came in sight around the curve. When it whistled, the foreman was at the east end of the bridge. Two members of the crew, Charles Lenkeit and George Holm, were about the middle of the bridge nailing tin to the ties. Decedent was on one of the caps on the south side of the bridge and about midway of its length, and on the next cap beyond was a man by the name of Ellis. These two men were engaged in "shimming" up or leveling the track. Holm testified that, when the whistle blew, he shouted, "It's coming," and ran to the west end of the bridge and got off on the north side of the track; that he had about a half minute to spare before the train came; and that he did not hear the foreman give any order to get off the bridge. He also testified that because of escaping steam, hot water, and cinders, it was dangerous to remain on the caps while a train passed over the bridge. Charles Lenkeit, who was also a witness for plaintiff, testified that, when the whistle blew, the foreman gave the order, "Clear the bridge." "Charley" (meaning the witness, "get off, and, Cunningham, stay where you are at," and that he (the witness) said, "Yes, you are safe, Cunningham." The witness then ran to the east end of the bridge and got off the track. He also testified that, when he reached the end of the bridge and looked back, the decedent was still on the cap; but that the the decedent then got up and jumped onto the deck of the bridge, and saying, "I think I can make it," ran towards the east end of the bridge; that, when decedent was about halfway to the end of the bridge he turned and looked back, then continued to run, but that, when he was about six feet from the end of the bridge, the engine struck him, and death resulted soon after. The witness also testified that just before the engine struck decedent, he (the witness) called "Jump! Jump! Jump!" that at that time decedent was not far from the ground and could have jumped and saved himself.

Train No. 18 was composed of nine or ten steel coaches, and with the engine weighed 900 to 1,000 tons. It was approaching

the bridge on a slightly downgrade and running at the rate of 65 to 75 miles an hour. The engineer testified that, when he came through the cut in sight of the bridge, he saw the men standing by the track; that he sounded a warning with the whistle and continued at full speed; that, when he was three or four car lengths from the bridge, a man jumped up on the bridge and ran towards the east end of the bridge; that he (the engineer) immediately applied the emergency brake, but said that it takes four to six seconds after the act of applying the emergency brake before the brake grips the wheels, and that, before that time expired, he was across the bridge, and that he released the brake and went on; that it was impossible to have stopped the train after the man got on the bridge; that, from his place in the engine, he could not see whether the man on the bridge was hit, and he did not know until he was notified at a station farther on that the man had been hit. Ellis, the man who was working on the cap next to decedent, remained where he was while the train passed over the bridge and suffred no injury.

There is an abundance of evidence, undisputed, that bridge carpenters make a practice of remaining on the caps while trains pass over the bridge; and there is no evidence to show that any one has ever been injured in any manner by so doing.

Rudolph Buckholtz, who was acting foreman of the bridge crew at the time of the accident, was a young man only 20 years old, and it is alleged in the complaint that he was incompetent to act as foreman and incompetent to have supervision over the members of said crew; that he usually and frequently failed to give proper warning of the approach of trains to the employees; and that such acts of incompetency and the fact that he was incompetent were known to defendant and to Herman Buckholz, the regular foreman of said crew.

It is alleged in the complaint that no guard or flagman had been posted on the track to flag approaching trains, and that defendant was negligent in so failing to post such flagman. It is also alleged that said train approached said bridge at a negligent and dangerous rate of speed, and that the defendant was negligent in failing to give plaintiff proper or sufficient warning of the approach of said train.

[1-4] The action is brought under the provisions of the

federal Employers' Liability Act (sections 8657 to 8665, U. S. Comp. St. 1918.) The appellant is a common carrier within the meaning of this act and is liable for injury or death resulting in "whole or in part" from the negligence of its officers, agents, or employees. Contributory negligence by the party injured is not sufficient in itself to defeat recovery. If the injury or death results "wholly or in part" from the negligence of the carrier, such carrier is liable to some extent, notwithstanding the negligence of the party injured. But after a careful study of the record in the case, we are unable to find wherein the appellant was guilty of negligence, or that it failed to take every reasonable precaution for decedent's safety. Decedent was engaged in repairing bridges over which he knew trains were constantly passing back and forth. It was not customary nor was there any rule that required, that trains should slow up or stop as they approached a bridge to give bridge crews time to leave the bridge, nor, under the circumstances shown in this case, is it necessary that they should. Where a man is working on a bridge over which trains are passing, he is entitled to sufficient warning of the approach of trains and an opportunity to get out of the way before the train reaches him, and, if he is given such warning and an opportunity to escape, it becomes his duty to act with reasonable promptness for his own safety. In this case there is no question that decedent knew that No. 18 would reach the bridge at about the time it actually arrived. He knew that it was a fast train, and there can be no doubt that he knew when it whistled, even though he may not have heard it himself, and that he knew that in order to leave the bridge before the train arrived he must act promptly. But in this case it does not appear that it was necessary for decedent to leave the bridge. He was in a place of safety before the train arrived, a place that was recognized and generally used as a place of safety for men engaged in the same business while trains were passing over the bridge. The fact that there is no evidence showing that decedent had ever remained on a cap while a train was passing over a bridge is not material. The fact remains that he was in a place of safety, and there is no doubt whatever that the foreman told him to stay where he was. True, the witness Holm testified that he did not hear such order given, but it is also true that when the train whistled Holm shouted,

"It's coming!" and ran for the west end of the bridge without waiting for orders from the foreman, and the fact that he reached the west end of the bridge and got off the track and had half a minute to spare before the train arrived shows that decedent had sufficient warning to have left the bridge before the train arrived.

Just what prompted the actions of decedent in climbing onto the deck of the bridge immediately in front of a swiftly approaching train can never be known. It is very apparent that his first intention was to remain on the cap while the train passed; but, as the train approached he evidently became frightened, or overawed by the idea of remaining so close to the track while the train passed, and decided to seek greater safety by getting off the bridge. But conceding this to have been the case, he had a means of escape without climbing to the top of the bridge and running to either end. It appears from the evidence that a portion of the structure of the bridge is what is known as sway braces. These are wooden planks spiked diagonally across the rows of piles reaching from the cap on one side of the bridge to the ground on the other. The evidence shows that it is not difficult to climb up or down on these braces and that bridge men do frequently and commonly climb up and down them. Decedent could have climbed down on the sway brace and reached the ground without taking the risk of getting in front of the engine at all.

After a careful examination of the record, we are satisfied the evidence does not support the verdict and defendant's motion for a directed verdict should have been granted.

The judgment and order appealed from are reversed.